**SOUTHERN STEVEDORING CO.,
Inc., et al.**

v.

**Hugh A. VORIS, et al.**

**No. 15096.**

United States Court of Appeals,
Fifth Circuit.

Jan. 7, 1955.

E. D. Vickery, John R. Brown, Houston, Tex., Royston & Rayzor, Houston, Tex., of counsel, for appellants.

Herbert P. Miller, Atty. U. S. Dept. of Labor, Washington, D. C., Malcolm R. Wilkey, U. S. Atty., Houston, Tex., C. B. Smith, Asst. U. S. Atty., Galveston, Tex., Harry H. Burns, Houston, Tex., Stuart Rothman, Sol. of Labor, Washington, D. C., of counsel, for appellee.

Before HUTCHESON, Chief Judge, RIVES, Circuit Judge, and DAWKINS, District Judge.

DAWKINS, District Judge.

This cause originated in a claim by Willie Wilson for compensation under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq., against Southern Stevedoring Co., Inc., and its compensation insurer, Texas Employers' Insurance Association, filed with and considered by Hugh A. Voris, Deputy Commissioner for the United States Department of Labor for the Eighth Compensation District in Galveston, Texas.

Claimant reported an injury on October 16, 1951, while working on a vessel in the Port of Houston, Texas, alleging that a load of dunnage being lifted in the hold of a vessel struck him on the upper portion of his back and the back of his head. He was immediately taken to a hospital in Houston and was there cared for by Dr. Paul W. Best, physician for the insurance carrier, where he remained until October 27th, following. For the remainder of October, November and until December 20th, he was treated by Dr. Best at his office, principally with heat therapy. On that date he was released as being able to return to work.

On January 23, 1952, Wilson collapsed at his home and was returned to the hospital where he was found to have paralysis (left hemiplegia). Best called in two other doctors, Bunting, an internist, and Goodall, a neuro-surgeon. All three doctors diagnosed the trouble as "spontaneous subarachnoid hemorrhage", but were of the opinion that it had no connection whatever with his injury of October 16, 1951. However, after full hearing, the Commissioner held to the contrary and found that the paralysis was caused or contributed to by the injury and the court below reached the same conclusion. The employer and insurer have appealed.

As stated by attorneys for appellants, the sole question presented here is: "Was there reliable, probative and substantial evidence upon a consideration of the whole record to support the Deputy Commissioner's finding that there was a causal relation between the claimant's injury of October 15, 1951, and the disability which resulted from a spontaneous subarachnoid hemorrhage in the brain on January 23, 1952?"

The contention below and here is that the case is covered by the Administrative Procedure Act, 5 U.S.C.A. § 1001, et seq., and the finding of the Commissioner should be set aside for the reason it is:

"(5) Unsupported by substantial evidence in any case subject to the requirements of Sections 1006 and 1007 of this title * * * "

* * * * * *

"In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error."

The Commissioner's findings of fact, supporting liability and recovery were as follows:

"That on the 16th day of October 1951, the claimant above named was in the employ of the employer above named at Houston, in the State of Texas, in the Eighth Compensation District, established under the provisions of the Longshoremen's and Harbor Workers' Compensation Act, and that the liability of the employer for compensation under said Act was insured by Texas Employers' Insurance Association; that on said day, claimant herein, while performing service for the employer as a longshoreman on the S. S. Reuben Tipton then upon navigable waters of the United States at Houston, Texas, sustained personal injury as a result of being struck on portions of his back and on the upper portion of the back of his head by a sling-load of dunnage; that he was knocked down due to this blow, striking various parts of his body; that he sustained a back sprain and cerebral concussion of undetermined degree; that claimant continued to complain of head symptoms and of back trouble from the date of injury until January 23, 1952, when he suffered a cerebral hemorrhage at his home; that medical findings do not indicate the exact location of such hemorrhage, but that it has caused partial paralysis of the left side of claimant's body, that is, in the use of his left arm and left leg; that claimant had a weakness and loss of use to some degree of the left arm and left leg throughout the period of time between the date of injury on October 16, 1951 and the date of the hemorrhage on January 23, 1952; that there has been an increase of the same symptoms following the hemorrhage on January 23, 1952 which claimant had between the date of injury and the date of the hemorrhage; that claimant has some degree of arterial hypertension as shown by examinations following the injury of October 16, 1951, and that medical opinion is divided as to whether the cerebral hemorrhage or stroke sustained January 23, 1952 was entirely the result of such hypertension or was due to and was hastened by the injury sustained by claimant on October 16, 1951; that, as a weakness in the use of claimant's left extremities was apparent following the injury of October 16, 1951 and that such condition continued until the stroke on January 23, 1952, and as there was an increase or intensity of the same symptoms following said stroke which he had prior to the stroke or hemorrhage, it is thereby found from all the evidence that the injury of October 16, 1951 was a material factor in causing the stroke and resulting increase in the loss of use of claimant's left arm and left leg; that notice of injury was given within thirty days after the date of such injury to the Deputy Commissioner and to the employer; that the employer furnished claimant with medical treatment etc., in accordance with Section 7(a) of the said Act until February 11, 1952; that the employer and insurance carrier are liable for any further medical treatment that may be of benefit or considered necessary on account of claimant's condition; that the average earnings of the claimant herein at the time of his injury amounted to the sum of $32.63 per week; that as a result of the in-

jury sustained, the claimant has been wholly disabled from October 16, 1951 to the present time, and has a continuing total disability for work; that he is entitled to 64⅔ weeks' compensation at $21.75 per week (⅔ of $32.63) from the date of injury to and including the date of last hearing in the case, January 9, 1953, amounting to $1404.43; that the employer and insurance carrier have paid thereon the sum of $425.00, leaving compensation due as of January 9, 1953 in the sum of $979.43; that Mr. Ben Grumbles, Attorney at Law, has rendered legal services in claimant's behalf in connection with this claim considered of a reasonable value of $300.00, and is entitled to a lien on compensation due to that extent;"

Thereafter appellants brought this action for review of the Commissioner's finding which was sustained by the court below. After reciting the procedure before the Commissioner and the latter's conclusion, as well as the contentions of the parties and the evidence of the lay witnesses and doctors, the Court itself reviewed the issues of fact as follows:

"Testimony in favor of the contentions of the claimant is of two types, the lay testimony of Wilson and his wife and the very meager medical testimony reflected by an unsworn ex-parte report of Dr. J. Markewich [appellant waived its objection to admission of the report]. It was the testimony of claimant and his wife that he had suffered headaches not only immediately after the accident of October 16, but frequently and repeatedly prior to January 23; that during this same interval, he had frequent dizzy spells, and had suffered an increasing "heaviness" and loss of use of his left arm and left leg; and that the symptoms which accompanied the stroke (namely, very severe headache, unconsciousness, complete paralysis of the left side) while far more severe, were similar to the symptoms which were manifest from the time of the accident to the date of the stroke. This testimony was discredited by proof that the claimant made no complaint to Dr. Best of any difficulty with his left arm or left leg during the long period that he was under treatment by this physician (which claimant admitted), nor was any such difficulty noticed by Dr. Best; in a written statement made to a representative of the plaintiff November 6, 1951, the claimant described a minor injury to his left leg long prior to the incident now in question, and stated that after recovery he had never experienced further trouble with his left leg; and certain contradictory statements in the claimant's own testimony.

"On September 12, 1952, the claimant was examined by Dr. J. Markewich. This was the only occasion on which this physician saw claimant except for a brief visit a few days prior to the hearing before the Deputy Commissioner of November 21, 1952, at which time he prescribed some pills. The report of examination, so far as is material here, expresses the opinion of the examining physician in this language:

" 'There is a good probability that this man had a hypertension prior to the accident and that the injury to his back and head aggravated and brought on the cerebral vascular accident sooner than it might have occurred. No one can tell for sure if he would have had a stroke or when he would have had it, but the fact remains that he did have it during the time of the original accident when he was still not well * * *.'

In connection with the expression of this medical opinion, it is noted that there is no showing that this physician has had any specialized training or experience in this field;

there is no showing that he examined the hospital reports or records showing claimant's condition and treatment during the two periods of hospitalization; or that he knew of or considered the results of the pneumoencephalogram, of the examination of claimant's spinal fluid, or other tests performed upon him. Having sought out Dr. Markewich so long after the accident, and on the eve of trial, it is perfectly apparent that claimant was seeking medical testimony, not medical treatment or advice. The opinion of the doctor seems to me little more than a generalization to the effect that whenever one suffers an attack of some kind, while recuperating from a prior accident or disease and hence is in a weakened or impaired state of health, there is 'a good probability' that except for the general weakened condition, the latter attack might have been avoided. For these reasons, I attach very little significance to such medical testimony.

"While the physicians who testified for the plaintiff expressed their opinion clearly that there was no connection between the accident and the stroke, admittedly this was only a matter of opinion. They did not undertake to testify that medical science could, with mathematical precision, rule out the possibility of some unknown connection. These opinions were arrived at without considering the fact that the claimant suffered the recurring dizziness, headaches, and progressive difficulty with his left leg and arm, as he has now testified was the case (if such testimony is to be believed). In claimant's favor, there is likewise the circumstance, always rather persuasive to the lay mind, that the claimant had for many years followed the same kind and character of work without incident, and while suffering from hypertension, was unaware of and unaffected by the condition; he received an injury to the head of some severity; and within a matter of three months thereafter suffered a cerebral hemorrhage. This time element alone strongly suggests some causal connection between the blow and the hemorrhage not long thereafter.

"In a most able and exhaustive brief, counsel for the plaintiff employer-compensation carrier argues that under the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq., which is applicable to the present judicial review of the findings of the Deputy Commissioner, O'Leary v. Brown [Pacific-Maxon], 340 U.S. 504 [71 S.Ct. 470, 95 L.Ed. 483], a more careful scrutiny is required of the courts in passing upon the sufficiency of the evidence to sustain administrative findings than formerly was the case, citing Universal Camera Corp. v. National Labor Relations Bd., 340 U.S. 474 [71 S.Ct. 456, 95 L.Ed. 456]. I agree with this contention. As I understand the Act, as interpreted by the Supreme Court in the last mentioned authority, the reviewing courts no longer should follow the practice which heretofore prevailed in many quarters, simply scanning the evidence offered by the successful party below, and on finding a scrap of evidence here, or a shred there, in support of the findings, categorically to affirm. It is the duty of the reviewing court now to determine, on the basis of the entire record, whether there is substantial, reliable, and probative evidence to support the findings of the administrative agency. As applied to the instant case, in my opinion, the determination of this question largely depends upon whether testimony of the claimant is to be accepted, or whether it is to be disregarded by reason of the impeaching circumstances. This is a matter primarily for the fact finding agency.

Before the Administrative Procedure Act, the evidence in this record would have been ample to support these findings. *Under present procedures, in my opinion, it is barely sufficient.*

"The foregoing disposes of the real controversy. In its complaint, however, plaintiff challenges certain other findings of the Deputy Commissioner (see Sec. 9, p. 3 of the Original Complaint). It is clear that the Deputy Commissioner adopted the claimant's testimony as to his symptoms between October 16, 1951 and January 23, 1952, and disregarded the strong impeaching testimony. In my opinion, he was justified in doing so. Attack likewise is made of findings which are purely evidentiary in nature and add little, if anything, to determination of the ultimate issues of fact. As example, the finding 'that medical findings do not indicate the exact location of such hemorrhage' is attacked. One of the plaintiff's physicians testified that he knew definitely the location of the hemorrhage; another testified that he had an opinion but that he could not definitely locate the hemorrhage. *Under such circumstances, I see no reason for disturbing such finding.*

"The only finding which may not be placed in either of the foregoing categories reads in part 'that medical opinion is divided as to whether the cerebral hemorrhage or stroke sustained January 23, 1952 was entirely the result of such hypertension or was due to and was hastened by the injury sustained by the claimant on October 16, 1951'. *I see little, if any, medical testimony that the stroke was due or hastened by the prior injury. In my opinion, however,*

*where the medical testimony to the contrary is not conclusive, lay testimony, and the surrounding facts and circumstances, may be sufficient to fill the gap. Hence, if this finding, standing alone, be somewhat inaccurate, it would not affect the outcome of the case."* (Emphasis supplied.)

The Court concluded that "the evidence is sufficient to support the findings and the award".

This is another instance where the principal testimony by defendant bearing upon the important question of fact as to whether the hemorrhage and consequent paralysis was due to or induced in whole or in part by the injury of October 16, 1951, is that of experts (doctors) employed and paid by the parties to the litigation, and without intending any reflection upon their integrity it must be assumed that they approached the matter with a sort of bias in favor of their employers and perhaps a prejudiced attitude that the claimant was "faking". Those of us who have had much experience with expert testimony in the field of medicine an other sciences know that quite often men of equal experience and integrity will differ in their opinions.

It would do no good to review at length the testimony for this has been done both by the Commissioner and the Court as quoted above. Nor would it help to indulge in a lengthy discussion of the authorities with regard to what constitutes substantial evidence to support the findings of the Commissioner. We are inclined to agree with Judge Connally that the case is a close one but are not prepared to disagree with him and the Commissioner, the latter having seen and heard most of the witnesses testify.

The judgment below is
Affirmed.