300 F.2d 741
 TODD SHIPYARDS CORPORATION and The Travelers Insurance
Company, Appellants,
v.
P. J. DONOVAN, Deputy Commissioner, United States Department
of Labor, Bureau of Employee Compensation, Seventh
Compensation District, et al., Appellees.
 No. 19285.
 United States Court of Appeals Fifth Circuit.
 March 13, 1962.
 
 Andrew P. Carter, of Monroe & Lemann, New Orleans, La., Ernest A. Carrere, Jr., of Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for appellants.
 Gene S. Palmisano, Asst. U.S. Atty., Ralph Jackson, New Orleans, La., Kathleen Ruddell, U.S. Atty., New Orleans, La., Charles Donahue, Solictor of Labor, Herbert P. Miller, Asst. Solicitor, George M. Lilly, Attorney, U.S. Department of Labor, Washington, D.C., of counsel, for appellees.
 Before HUTCHESON, WISDOM, and BELL, Circuit Judges.
 WISDOM, Circuit Judge.
 
 
 1
 In this action Todd Shipyards Corporation and its insurer sued to set aside a compensation award under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. 921. Ferdinand Lange, the claimant, suffered a heart attack while at work. The Deputy Commissioner for the Bureau of Employee Compensation of the Department of Labor awarded Lange compensation based on total disability. The appellant contend that the case presents solely a medical question: Was there a causal connection between the claimant's myocardial infarction, which might have occurred anywhere and at any time, and the claimant's employment? They argue that the record contains no medical testimony in support of the Commissioner's finding that the infarction was caused by the nature of Lange's employment and arose out of and in the course of the employment; they aver that two outstanding authorities on cardiovascular diseases, who testified, refused to say that the infarction was the result of the work Lange had been doing. The district court upheld the Commissioner, granting a summary judgment for the defendant. We affirm.
 
 
 2
 The appellants' argument has the lure of logic and the appeal of oracular authority. But then logic is false; and, with due deference, it seems to us that the heart specialists gave Delphic oracles. The appellants oversimplify the case. The problem this case presents is not solely a medical one, but is compounded of inextricably mingeld elements of fact, medical opinion, and inference. Thus, the occurrence of Lange's heart attack immediately following strenuous activities in itself raises an inference of a causal relationship between the activities and the attack. It is true that the distinguished heart specialists, having a proper regard for their oath, as honest scientists were unwilling to say categorically that Lange's activities in his employment caused the infarction. But they were unwilling to say that it did not cause the infarction. Their unwillingness to make a flat choice between the two inferences does not relieve the Commissioner of his responsibility to select the more reasonable inference in the light of the evidence as a whole and the 'common sense of the situation.'[1] We review the findings of the Commissioner and the holdings of the district court, not the opinions of the medical experts.
 
 
 3
 This Court and many courts have upheld findings of triers of the fact who reached conclusions contrary to the weight of the medical testimony. In Sentilles v. Inter-Caribbean Shipping Copr., 1959, 361 U.S. 107, 80 S.Ct. 173, 4 L.Ed.2d 142, the Supreme Court said:
 
 
 4
 'The jury's power to draw the inference that the aggravation of petitioner's tubercular condition, evident so shortly after the accident, was in fact caused by that accident, was not impaired by the failure of any medical witness to testify that it was in fact the cause. Neither can it be impaired by the lack of medical unanimity as to the respective likelihood of the potential causes of the aggravation, or by the fact that other potential causes of the aggavation existed and were not conclusively negated by the proofs. The matter does not turn on the use of a particular form of words by the physicians in giving their testimony. The members of the jury, not the medical witnesses, were sworn to make a legal determination of the question of causation. They were entitled to take all of the circumstances, including the medical testimony into consideration.'
 
 
 5
 In Southern Stevedoring Co. v. Voris, 5 Cir., 1955, 218 F.2d 250, 255, this Court sustained the district court's finding:
 
 
 6
 'I see little, if any, medical testimony that the stroke was due or hastened by the prior injury. In my opinion, however, where the medical testimony to the contrary is not conclusive, lay testimony, and the surrounding facts and circumstances, may be sufficient to fill the gap. Hence, if this finding, standing alone, be somewhat inaccurate, it would not affect the outcome of the case.'
 
 
 7
 See John W. McGrath Corp. v. Hughes, 2 Cir., 1961, 289 F.2d 403. If the issue is one of disability, the testimony of laymen who may have observed a claimant over a long period of time at any hour of the day may be more trustworthy than medical testimony. If the issue is one of causal relationship, medically, between injury and employment, medical testimony may be more trustworthy than lay testimony; still, fact-finders are not bound to decide according to doctors' opinions if rational inferences lead in the other direction.
 
 
 8
 Dr. George E. Burch, a nationally known authority on cardiovascular diseases and cardiology and a Professor of Medicine at Tulane University, whom the plaintiff called as a witness, made a written report in which he states:
 
 
 9
 'It would be impossible for me to say that this infarction was the result of the type of work in which he was engaged since he has been doing this same type of work for 38 years without any difficulty.'
 
 He testified:
 
 10
 'I couldn't find any evidence that he had had any symptoms or signs of heart disease prior to this, except what I said a moment ago, the changes that one would expect in a man who is going through the aging process. * * * Now, we do know that stress at the time when people have difficulties with their heart, or if they are in the process of developing difficulty with the heart, will add extra loads on the heart, and can precipitate trouble. But to say that that particular experience that he had, which I gather he has been going through before, actually precipitated this, or that he would not have had it if he were not doing that particular job, or working somewhere else, I don't see how I could say that. On the other hand, it would be impossible to say that it didn't do it. It is just like the straw that broke the camel's back. If he were in the process of developing this and the stress did come about, it is possible that it could have precipitated it. On the other hand, a man his age is prone to develop infarction and a statement is made that 1 out of 2 people are going to develop or die of heart disease. It is difficult to say this one did, but I couldn't say that he didn't. * * *
 
 
 11
 'Q Doctor, back to stress again, you have testified that stress does precipitate this type of infarct?
 
 
 12
 'A That's right. I think stress can. When someone is in the process of developing this, I think the stress might, it is possible to precipitate it.
 
 
 13
 'Q I believe it is your testimony that it is impossible to say that this stress that Mr. Lange experienced did not cause this?
 
 
 14
 'A That's right. I couldn't say that it didn't.
 
 
 15
 'Q In other words, it could have?
 
 
 16
 'A Yes.'
 
 
 17
 Dr. Theodore Bloch, an established heart specialist, called by the employer, concluded his testimony as follows:
 
 
 18
 'Q. It has been testified here 'It would be impossible for me to say this infarction was a result of the type of work in which he, meaning Lange, was engaged, since he had been doing the same type of work for 38 years without any difficulty.' Would you be in agreement with that statement?
 
 
 19
 'A. Yes, I would.
 
 
 20
 'Q. Then I take it then that your conclusion is that there is no connection with the work Mr. Lange was doing and occurrence of the myocardial infarct?
 
 
 21
 'A. That is my conscientious feeling, after looking this over in the light of everything I have available, yes, I would say that.'
 
 But he testified also:
 
 22
 'Myocardial infarction is due to metabolic abnormality of the blood vessels that supply the heart, and I find it difficult to relate work as a cause of this situation. * * * The pathology is there, but it is analogous to the situation where a feather is on this paper, for example, and I would walk by it, the breeze from my walking by it might make the feather fall from the table. Well, the feather was going to fall at sometime. Now, if there was enough breeze and even just a little breeze could do this, now the relationship to work of coronary occlusion is whether or not a little breeze, as it were, could precipitate this. * * * The only situation in which I could conceivably think that work could cause a coronary, rather a myocardial infarction, when we use the term myocardial infarction we mean death of tissues, the only time that I could concede that, and this is pretty well substantiated is if an individual has a damaged heart and exerts himself very strenuously in an unusual type of effort, an unusuall type of effort could conceivably result in a so-called ischemic myocardial infarction. In other words, infarction of the myocardium, death of tissue without an actual blockage of a blood vessel being present. * * * Apart from this cause of a blood clot occurring, it is felt that the ischemic infarction, in other words the infarction that occurs without a clot actually forming, can only be caused if (1) there is marked diminution of oxygen supply with actual lack of enough oxygen getting to the heart muscle. This would then cause-- in other words the blood vessels could not carry enough exygen to the heart muscle. (2) if there was the development of a marked increased work load on the part of the heart by excess activity in the presence on impaired blood supply to the heart. So that work as a factor in causing a myocardial infarction, I would think that it is not at all related to the occurrence of a blood clot per se, but would have to be related to so-called ischemic infarction. In other words, the death of the muscle occurs because there is lack of blood supply to the heart muscle. In other words, the work load has been increased beyond that which the heart can supply blood to itself. There is impairment of circulation of the vessels of the heart, and an excess amount of work could cause this sort of thing, or there is a lack of oxygen supply to the heart muscle itself through any of a number of mechanisms. So in answer to the question, do I think that work can cause myocardial infarction, in certain instances, I would think that with extrardinarily unusual severe activity, ischemic infarction could conceivably be said to occur. But in the vast majority of cases that this is not the situation.'
 
 
 23
 Bearing in mind the biforked medical testimony, we turn now to the facts. At the time of his heart attack Ferdinand Lange was fifty-nine years old. , He was an iron worker. Using an acetylene torch, he burned iron. The process produces heavy fumes because of the rust and paint on the metal. 'The more paint you got', he said, 'the more smoke you got.' 'The worse of it is * * * the rust pops and it has got fumes behind the paint.' He worked in cramped positions, in close quarters; sometimes they were 'just big enough for you to get your head in'.
 
 
 24
 On the day he became ill, Lange worked from 4:30 to 6:00 p.m. in removing stairways from the bridge deck of a ship to the main deck, work that included cutting out a plate on the deck. After completeing this job, he was required to burn out a frame in the shaft alley under the deck of another ship. The shaft alley is 'a round tunnel * * * about seven feet high * * * five or six feet wide * * * and it runs * * * about 150 feet long'. There were no blowers and the smoke in the shaft alley was so heavy that eight or nine other employees stopped work. Lange stuck it out until he completed his assignment. This occurred before the supper break, that is, before 8:30 p.m. Lange was unable to eat his supper. After the break, he was assigned to burn paint off the diaper plate in the stern of the ship where the rudder post comes through. When the plate was removed there was a hold approximately two and a half feet in diameter. He had to go in the hole along the rudder post and burn out the brackets holding the plate. There 'was nothing but smoke' because of the rust and paint on the inside. He 'began feeling worse and worse'. Lange, 'twisted all kinds of ways,' did all of this work on a scaffold thirty feet above ground. He had to hold his heavy acetylene torch about twelve inches above his head. He had to keep shaking the heavy plate to get it loose. After the plate finally was lowered into the dry dock, he 'hung (his) head over the keel block and * * * started to vomit'. This was a little after midnight. At 12:30 a.m. he left the vessel and started up the wharf but he had the 'shakes', his legs 'buckled', and he tried to vomit but only gagged. He sat down in the middle of the dock. Some mechanics put him in a stretcher, carried him to the wharf and called for an ambulance. There is no dispute as to his total disability.
 
 
 25
 Judge Holmes, writing for this Court, formulated the principle we consider the proper guide in the case at bar:
 
 
 26
 'The Act gives compensation for accidental injury or death arising out of and in the course of employment; it does not say caused by the employment. There is no standard or normal man who alone is entitled to workmen's compensation. Whatever the state of health of the employee may be, if the conditions of his employment constitute the precipitating cause of his death, such death is compensable as having resulted from an accidental injuy arising out of and in the course of his employment. If the workman overstrains his powers, slight though they be, or if something goes wrong within the human frame, such as the straining of a muscle or the repture of a blood vessel, an accident arises out of the employment when the required exertion producing the injury is too great for the man undertaking the work; and the source of the force external.' Southern Stevedoring external.' Southern Stevedoring Co. v. Henderson, 1949, 5 Cir., 175 F.2d 863, 866.
 
 
 27
 In the Henderson case the deceased employee suffered a heart attack on deck, after climbing a ladder. Judge Holmes cited Clover, Clayton & Co. v. Hughes, L. R. Cases 1910, p. 2422, 3 B.W.C.C. 275 in which compensation was awarded for the death of an employee who had an aneurism of the aorta which might have burst while the man was asleep but which in fact ruptured while he was simply tightening a nut with a wrench. For cases involving facts similar to the case a bar, see Pittston Stevedoring Corp. v. Willard, 2 Cir., 1951, 190 F.2d 267; Commercial Casualty Ins. Co. v. Hoage, D.C.Cir., 1935, 64 App.D.C. 158, 75 F.2d 677, cert. den'd 295 U.S. 733, 55 S.Ct. 645, 79 L.Ed. 1682; London Guarantee & Accident Co. v. Hoage, D.C.Cir., 1934, 63 App.D.C. 323, 72 F.2d 191; Pacific Employers Ins. Co. v. Pillsbury, 9 Cir., 1932, 61 F.2d 101.
 
 
 28
 Considering the record as a whole and the common sense of the situation in the light of the medical testimony, we cannot say that the Commissioner erred in making his award to Lange. Substantial evidence supports the inference Dr. Burch acknowledged as a permissible inference: the physical strain to which Lange was subjected and the lack of oxygen, caused by dense smoke and fumes in close quarters, were the straws that broke the camel's back.
 
 
 29
 Judgment is affirmed.
 
 
 
 [1]
 Avignone Freres, Inc. v. Cardillo, 1940, 73 App.D.C. 149, 117 F.2d 385