84 So.2d 223 (1956)
John E. SMITH
v.
W. HORACE WILLIAMS COMPANY, Inc., and The Employers' Liability Assurance Corporation, Ltd.
No. 20507.
Court of Appeal of Louisiana, Orleans.
January 3, 1956.
Rehearing Denied January 16, 1956.
Writ of Certiorari Denied February 23, 1956.
Frederick J. Gisevius, Jr. and Robert F. Shearman, New Orleans, for plaintiff-appellee.
Deutsch, Kerrigan & Stiles, New Orleans (Marian Mayer and Christopher Tompkins, New Orleans, of counsel), for defendants-appellants.
JANVIER, Judge.
This remarkably complicated controversy over a claim for workman's compensation results from an accident which occurred on July 24, 1952, while the plaintiff, John E. Smith, was carrying out the duties of his employment by W. Horace Williams Co., Inc.
Smith sustained physical injuries which admittedly totally disabled him until March 6, 1953 when, by all of the physicians and surgeons of his employer and its insurance carrier, The Employers Liability Assurance Corporation, Ltd., he was discharged as able to return to his former employment. Full compensation was paid to him to *224 April 13, 1953, at which time his attorneys were sent a letter which contained the following paragraph:
"It would seem that we have fulfilled our obligations under the Louisiana Compensation Act to Mr. Smith and that no further benefits are in order. However, if Mr. Smith is still alleging disability then will you please furnish us with medical reports supporting his claim."
Not satisfied that he was able to return to work and taking the position that he was still totally disabled, Smith consulted a general medical practitioner of his own selection who, feeling that the condition of Smith was such as to require the attention of an orthopedic specialist, referred him to Dr. W. Hammond Newman who specializes in that field. From that time on he was examined by numerous orthopedic specialists, neuro-surgeons and other doctors selected by him and numerous X-ray photographs were taken. On January 22, 1954, he filed this suit seeking maximum compensation for total permanent disability, together with an allowance for all medical expenses which he had incurred, penalties as provided by law in certain cases, and attorney's fees.
The defendants are the employer and its said insurance carrier. Both admit the occurrence of the accident, but aver that at the time of his discharge as able to return to work, he was paid compensation for the full period of disability and that all necessary medical expenses were defrayed by them.
From a trial which required more than two weeks, there resulted a record of more than 1,200 pages of testimony, a separate volume of pleadings more than three inches thick, and a package of more than fifty exhibits. There was judgment in favor of plaintiff for $30 per week for 400 weeks subject to a credit for such compensation payments as had been made. The claim for additional medical expenses and for penalties and attorney's fees was rejected.
Defendants appealed devolutively and suspensively, and plaintiff answered the appeal praying that he be awarded additional medical expenses amounting to $790.54; that he also be awarded the penalty provided for arbitrary or capricious refusal to make payment, and for attorney's fees at 20% of the entire amount.
In holding that the plaintiff was entitled to compensation for total permanent disability, the District Judge rendered very brief reasons reading as follows:
"The Court, after considering the pleadings, evidence, argument and briefs of counsel, is unable to find from the evidence that the plaintiff is a malingerer and has attempted to perpetrate a fraud upon the court, but must hold that he is totally and permanently disabled and entitled to compensation at the rate of $30.00 per week, beginning July 24, 1952, not to exceed 400 weeks * * *."
Counsel for defendants vigorously criticize these reasons, saying that it would appear that the District Judge approached the problem from the wrong end, and that he seems to have decided that the burden of proof rested upon defendants to prove that the plaintiff is not seriously injured, is able to return to work, and is in fact a malingerer, whereas it is well settled that in compensation cases, as in all others, the initial burden rests upon plaintiff.
It is true that the District Judge did commence his reasons for judgment with a reference to the contention of the defendants concerning malingering, but he concluded by finding that the plaintiff was actually disabled. Had he first found disability and then stated that he did not find that the plaintiff was malingering, his reasons would not have been subject to the criticism which is now hurled at them.
That the accident was a serious one is obvious. The plaintiff was working on the upper end of a boom of a crane which toppled over. There is some dispute as *225 to the height from which he fell. The distance of 45 feet appears in statements of various witnesses. Defendants contend that he was about 20 or 25 feet from the ground and that when the boom toppled over he was thrown a distance of 20 or 25 feet from its base, and that the 45 feet mentioned results from the additional height of about 25 feet and the distance of about 20 feet from the base of the boom, whereas the plaintiff contends that he was 45 feet in the air when he fell to the ground.
It is not necessary that we reach a conclusion on this issue. He fell from a considerable height, and his head hit the ground and was embedded for a time in the mud near the base of the machine. He was taken to a local hospital where it was found that his injuries consisted of a fracture of the right mandible, fracture of the second, third and fourth right transverse processes of the lumbar vertebra, fractures of the third and fourth left transverse processes of the vertebra. It also appears that there was a fracture of the spinous process of the left third lumbar vertebra. There were also numerous cuts and abrasions, particularly on his face and lips and inside his mouth. At that time it seems that there was no finding of any serious injury to any of the bones of or near the neck.
Plaintiff remained under the treatment of the various physicians and specialists of the defendants until his discharge on March 6, 1953.
Never have we been confronted with a more formidable record of contradictory medical testimony. We feel that no good purpose would be served by a detailed discussion of the tremendously technical aspects of the contradictory evidence even if we felt ourselves able to thoroughly understand and estimate this evidence in detail.
We are absolutely convinced that, so far as the various fractures and other injuries to which we have referred are concerned, the plaintiff has fully recovered, except for the contention as to the present condition of his neck and shoulder. All of the fractures seem to have completely knitted and there seems to be no residual disability from any of them except for the fact that it is contended now that the nerves of his neck have been so injured that he cannot hold his head in a proper position and must keep his head bent forward and his right shoulder elevated considerably above its normal position.
It seems very certain that when the plaintiff, after being discharged by the defendant's experts, consulted his own general practitioner and was referred by him to Dr. Newman as an orthopedic specialist, Dr. Newman found that the knitting had been complete and that no disability resulted from the fracture.
That the original fractures no longer caused disability is made evident in two waysfirst, by the testimony of Dr. Newman and, second, by the vigorous attempt of counsel for plaintiff to avoid the effect of what they knew that testimony would be. Plaintiff had subpoenaed Dr. Newman. Yet counsel for plaintiff, during his examination of Dr. Newman, stated that he was examining him as a "hostile" witness. The District Judge stated that he considered Dr. Newman a witness for plaintiff.
Dr. Newman found evidences of the limited fractures, but very clearly stated that the plaintiff could return to work if he was willing to do so.
When we consider the testimony of the other physicians and experts, we reach the conclusion that there can be no doubt that there was a substantial preponderance of expert opinion to the effect that plaintiff is no longer disabled. As a matter of fact, it seems that, while there has been no admission by counsel for plaintiff that the original fractures have knitted and that there is no disability resulting from them, it is evident that the major portion of counsel's argument was devoted to what is now the principal contention,that the disability results from a fracture of the mandible which, in turn, interferes with the *226 operation of the nerves of the neck, which interference also in turn prevents plaintiff from maintaining his head in an erect position, requires him to stoop forward, and prevents him from maintaining his right shoulder in its normal position.
Strangely enough there was no reference to any such abnormality of the right shoulder in the original contentions and no X-ray photographs of that area were deemed necessary.
There is considerable lay evidence of neighbors and friends on the one hand, and of two detectives and an adjuster for the defendant insurance company on the other. The neighbors and friends are certain that plaintiff is permanently incapacitated and that his neck and head are constantly bent forward and his right shoulder is always abnormally elevated, whereas the two detectives and the adjuster who talked with him at unsuspicious times all stated that they saw nothing abnormal about plaintiff's posture. One of the detectives stated that when he saw him at an unsuspicious time his posture in no way resembled that which was evident when the plaintiff was in the courtroom during the trial.
Referring again to the medical evidence, let us say that there can be no doubt that the medical experts who testified on behalf of plaintiff, with the exception of Dr. Newman, were of the opinion that plaintiff was totally disabled. However, as justification of our very grave doubt, let us quote from the reports of several of the experts who hold contrary opinions.
We quote from the report of Dr. Berkett:
"* * * It is my feeling that this patient is able to return to his previous occupation from the point of view of his back and cervical spine, * * *"
We quote from another report of Dr. Berkett:
"* * * It is my opinion that this patient has recovered from any injuries that he had sustained to his cervical spine and his back, as a result of the injury of July 24, 1952, without appreciable disability. * * *"
Dr. Howard Kerr, another expert, in his report, said:
"Examination of the spine revealed no restriction of motion in any direction and there was normal reversal of the lumbar curve on forward bending. There was no tilt or list and no paravertebral muscle spasm."
And his conclusion was stated as follows:
"The examination of this patient failed to disclose any objective findings with respect to his back and neck and revealed no evidence of disability which is incapacitating for the performance of his work."
Dr. Lyon K. Loomis in his report made the following statement:
"* * * I see no reason why this man cannot be returned to the full duties of his regular work."
We repeat however that in spite of the evidence of these experts, there is evidence to the contrary given particularly by Dr. Blaise Salatich and Dr. Jose Garcia-Oller.
When Dr. Salatich was placed on the stand, his qualifications as an expert orthopedist were questioned and the District Judge on several occasions stated that he hoped that this Court would advise him as to whether Dr. Salatich should be considered an expert.
Although Dr. Salatich conceded that he had never been admitted to the American Board of Orthopedic Surgery and had twice been unable to pass the second examination of that Board, and that the third time the Board had refused to permit him to take the examination because he did not devote himself exclusively to that specialty, it appears that he graduated from the medical college of the Louisiana State University in 1939, and that since that time he has practiced his profession, specializing in orthopedic surgery. He stated that he is recognized as an Orthopedist in Charity Hospital, Hotel Dieu, Lakeshore *227 Memorial Hospital, and Metairie Memorial Hospital, and as a consultant at the Southern Baptist Hospital. He also stated that until the time of its "deactivation" he "worked on the Independent Unit Orthopedic Division" of Charity Hospital, having been appointed "Chief of Orthopedics."
It is regrettable that the doctor has not been admitted to membership in the American Board of Orthopedic Surgery, but that fact in our opinion would not justify refusal to accept his testimony as an expert in that specialty to which he has devoted himself since his graduation in medicine, though it might affect the weight which should be given to his opinions when contradictory to opinions of those who have qualified for admission in that well recognized group of specialists. The doctor himself, by his own efforts to gain admission, has evidenced the desirability of being recognized by that group.
We would have been more favorably impressed with the testimony of the doctor had he not laid so much stress on the great number of "cases" which he had "won" in various courts as compared with the few which he had "lost". We have always entertained the view that doctors neither "win" nor "lose" cases in which they testify as experts.
The interesting thing about the testimony of Dr. Garcia-Oller is that apparently he now is of the opinion that the disability results from the neck condition about which little or nothing was said when the accident first occurred. It is evident that this condition was not considered serious then, since, as we have already said, no X-ray photographs were made of that area. This expert was of the opinion that the loss of sensation in that area "is due to a fracture of the jaw with laceration to the nerve of the jaw", and that as a result of that, "the back of his head * * * was tilted to the left and the chin to the right and the right shoulder was considerably at a different height than the left shoulder."
A study of this tremendous record leaves us almost hopelessly confused. All that we can say is that were it not for the finding of the District Judge that the plaintiff is disabled, we would have reached the conclusion from the record that he has not made it certain that such disability actually exists. However, in view of the finding of the District Judge we think that it would not be proper to say that there is manifest error and therefore we hesitatingly apply the well established doctrine that the finding of a District Judge on a question of fact should not be disturbed unless manifestly erroneous.
Counsel for plaintiff assert that if compensation is due there should be assessed a penalty of 12 per cent because of the refusal of the insurer to make payment within sixty days of the receipt of proof, and they base this contention, they say, on the "Workmen's Compensation Law of this State, more particularly, Act 417 of 1952."
Act 417 of 1952, which is found in LSA-R.S. 22:658, in providing for this penalty in certain cases provides that it is due where there is failure, but only "when such failure is found to be arbitrary, capricious, or without probable cause". From what we have already said it clearly appears that in our opinion there was nothing capricious or arbitrary about the refusal to make payment in this case.
The question presented by the contention of plaintiffthat the defendant, The Employers Liability Assurance Corporation, Inc., if liable to him in compensation is also liable for medical expenses incurred by him in excess of the amount already expended by it, is an interesting one.
The record shows that the insurer expended $1,374.61 for medical and hospital services and medicines. At the time of the occurrence of the accident from which this suit results the liability of the employer or the insurer for medical attention was fixed in the then applicable statute at $500. LSA-R.S. 23:1203. It is true that, by Act 322 of 1952, this amount was increased to $1,000, but that statute did not become effective until the twentieth day after the adjournment of the Legislature which adjournment *228 was had on July 10, 1952. So that at the time of the accident the liability of the employer or its insurer for medical expenses was limited to $500. However, whether, at that time, the liability for medical expenses was fixed at $500 or $1,000 is unimportant since the insurer actually expended more than $1,000.
Our attention is called to a provision in a medical coverage endorsement of the policy, certain provisions of which read as follows:
"1. In addition to any payments which are required under Division (2) of Paragraph One (a) of the Policy by the provisions of the applicable Workmen's Compensation Law, the Company will also pay the reasonable and proper cost of any additional medical, surgical, nurse or hospital services, medical or surgical apparatus or appliances and medicines which in the opinion of the Company may be reasonably necessary for the treatment of injuries sustained by any person who is entitled, on account of such injuries, to the benefits afforded under Division (2) of Paragraph One (a) or who is entitled to such benefits under other terms of the Policy; provided, however that such person or his legal representative, however, shall, as a condition precedent to the effective operation of this endorsement, give to the Company a written release of any and all rights that he may have against any third party by reason of the expenditures made for such medical, surgical, nurse or hospital services, surgical apparatus or appliances and medicines.
"2. The Company's liability under this endorsement shall be limited to $10,000.00 on account of each person for whom benefits are payable under Paragraph 1 of this endorsement."
Counsel for plaintiff direct attention to these provisions and maintain that in addition to the amount which the insurer or the employer may have already paid in medical, hospital or related expenses, the plaintiff himself incurred medical attention at a cost of $790.54. And it is argued that since an injured employee, where the employer has secured insurance, may maintain a direct action against the insurer, and since the medical expenses which were paid by the plaintiff were "reasonably necessary for the treatment of the injuries sustained," the insurer is liable to plaintiff for such additional medical expenses.
The insurer, on the other hand, maintains that there is no such liability for two reasons,first, because under the provision relied on by plaintiff, there is no liability unless the additional expenditures "in the opinion of the company" are reasonably necessary, and second, for the reason that there is no liability under such provision unless, as a condition precedent, the injured person shall "give to the company a written release of any and all rights which he may have against any third party by reason of the expenditures made for such medical, surgical, nurses or hospital services, surgical apparatus, appliances and medicines." And counsel for the insurer say that not only were the expenses not reasonably necessary in the opinion of the insurer, but that the insurer had no knowledge that they were being incurred.
We are of the opinion that, in such case, even if the insurer may be liable directly to the injured party for such additional medical expense there is no liability here for the reason that the insurer knew nothing about the incurring of the additional expenses and therefore had no opportunity to determine whether they were reasonably necessary.
Our conclusion is that there is no liability for additional medical expenses.
The judgment appealed from is affirmed at the cost of appellants.
Affirmed.