**NOBLE DRILLING CORPORATION,**
Employer,

and

**Aetna Casualty and Surety Company,**
Insurance Carrier,

v.

**P. J. DONOVAN, Deputy Commissioner,**
United States Department of Labor,
Bureau of Employees' Compensation,
Seventh Compensation District.

Civ. A. No. 14814.

United States District Court
E. D. Louisiana,
New Orleans Division.

March 16, 1967.

W. Ford Reese, George V. Baus, Adams & Reese, New Orleans, La., for plaintiff.

Frederick W. Veters, Asst. U. S. Atty., for defendant.

HEEBE, District Judge.

This matter arises out of a suit brought by the former employer of one J. B. Goins, and the employer's compensation insurer, seeking review of a compensation award to Goins under the Longshoremen's and Harbor Workers' Act by the Deputy Commissioner of the Bureau of Employees' Compensation, U. S. Department of Labor (hereafter the "Commissioner"). The Commissioner moved for summary judgment dismissing the employer's suit; that motion was granted previously by the Court, Judge Ellis presiding, after supplemental findings of fact were obtained from the Commissioner on remand. The employer then

moved for a rehearing of the Commissioner's motion; rehearing was granted and the motion was heard again and taken under submission. Due to Judge Ellis's illness, the matter stood in that posture until May 1966, at which time the Court requested that the attorneys re-argue the rehearing, after which the Court took the motion under submission again.

■ Review of the Commissioner's order is sought in this Court by the employer pursuant to § 21(b) of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 921(b). Although that section states that the Commissioner's compensation orders may be suspended or set aside "if not in accordance with law" and that the method of seeking such review must be "through injunction proceedings * * * brought by the party in interest against the deputy commissioner * * *." (33 U.S.C.A. § 921(b)), it appears that the scope of judicial review under the section is governed by the Administrative Procedure Act, 5 U.S.C.A. § 551 et seq.[1] We therefore look to the pertinent provisions of the latter Act, in particular to § 10. Regarding review of an agency's findings of fact, that section provides in part:

"[The reviewing court] shall * * * hold unlawful and set aside agency action, findings and conclusions found to be * * *

(5) unsupported by substantial evidence in any case subject to the requirements of sections 7 and 8, or otherwise reviewed on the record of an agency hearing provided by statute * * *.

"In making the foregoing determinations the court shall review the whole record * * *." 5 U.S.C.A. § 706

The question to be determined is thus whether or not the findings of fact by the Commissioner, entitling Goins to compensation, are supported by "substantial evidence" on a review of "the whole record."

\* \* \* \* \* \*

In his supplemental report upon remand, the Commissioner made the following findings of fact:

"That [claimant's] injury of April 23, 1961, resulted in (1) fracture of the acromion process of the left scapula with (2) ligament and muscle injury to the left shoulder area, (3) marked restriction of the cervical spine movements in all cardinal directions, (4) soreness to palpitation of the interspinous ligament in the mid and lower cervical area, and (5) traumatic paralysis of the right long thoracic nerve with resultant winging of the right scapula \* \* \*." (numeration supplied)

The accident of April 23, 1961, and the initial injury of the claimant, Goins, resulting therefrom were admitted by the parties; the employer, however, claimed that all of Goins' injuries had healed to the point that he was able to return to his usual employment as of April 2, 1962, and employer denied any liability for compensation payments allegedly due after that date. The Commissioner's order was based in large part on his finding that Goins continued disabled past April 2, 1962, and until June 22, 1964, the date of the hearing. The employer now contests the Commissioner's finding of disability subsequent to April 2, 1962, and in effect seeks, through the injunctive process, a modification of the Commissioner's order only insofar as it was based on that finding.

In making his determination of continuing disability, the Commissioner found that injury (1) noted above—the fracture of Goins' collarbone—had healed as of March 21, 1962; he also noted that injury (5) required no further medical care. The Commissioner, in fact, only

---

1. O'Leary v. Brown-Pacific-Maxon, Inc., 340 U.S. 504, 71 S.Ct. 470, 95 L.Ed. 483 (1950); Southern Stevedoring Co., Inc., v. Voris, 218 F.2d 250 (5th Cir. 1955); Riley v. Henderson, 218 F.2d 752 (5th Cir. 1955).

found that Goins' *disability* to work was due to original injuries (3) and (4):

"The marked restriction of the cervical spine movements with soreness of the interspinous ligament in the mid and lower cervical area prevent the claimant from raising his left arm above shoulder level and prevent him from performing normal duties of his occupation [and] require further medical care * * *." (Supplemental Report, January 26, 1965, page 2)

The only questions presented here are thus: (1) was there "substantial evidence on the record as a whole" to sustain a finding of "marked restriction" and "soreness" of the cervical spinous area subsequent to the date of April 2, 1962, (2) did such conditions, if they then existed, actually disable claimant from engaging in his former employment, and (3) were such conditions, if they did then exist, attributable to the accident of April 23, 1961? If there was "substantial evidence" for the Commissioner's finding of "marked restriction" and "soreness" of the cervical spinous area of the claimant, it could well be beyond the scope of the Court's reviewing power to question an inference of disability therefrom. See Davis, Administrative Law Treatise, § 29.05.

■ However, we cannot accept the conclusion that there was any abnormal physical condition of Goins' cervical spine to warrant the Commissioner's findings of "marked restriction of movement" and "soreness" of the cervical spine; there is no substantial evidence in the record to warrant such a conclusion, as a review of that evidence will show.

The evidence taken by the Commissioner consisted solely of (1) the testimony of Goins himself, and (2) the various medical reports of eleven doctors who examined and treated Goins, six of whom were made available to Goins by his employer, and five whom Goins contacted for himself.

From Goins' own testimony (Commissioner's Report, pp. 19–50) the following picture emerges:

Goins injured his left shoulder in the course and scope of his employment on April 23, 1961, when he fell from a pipe barge between that barge and a drilling barge. Following the accident, Goins continued at his job until May 22, 1961—about one month's time—on which date he was either discharged by the employer or absented himself from work voluntarily; nothing in the record gives the slightest indication of the reason for the layoff.

The employer voluntarily paid Goins compensation benefits from May 23, 1961, through April 2, 1962, but on that date ceased all payments. Goins claims that he has remained totally disabled since May 23, 1961, up to the date of the Commissioner's hearing on June 22, 1964, and continuing. His employer claims that Goins was actually fully cured and able to return to his work as of April 2, 1962, and perhaps as early as November 3, 1961. (Report, page 12) Goins' testimony establishes that he did do bartending work subsequent to April 1962—in particular from June 1963 to October 1963; however, in view of the diverse character of the employments of roughnecking and bartending, ability to do work in the second area would not preclude a finding of total permanent disability as to the first employment.

Although Goins' testimony is of little value in establishing the dates on which he consulted with the various physicians whose reports appear in the record, or the approximate length of treatment, it was admitted by all parties that he was examined and treated by doctors provided by his employer within one to two months of the accident and thereafter until approximately April of 1962, and that Goins' secured his own examinations and treatment by doctors of his own choosing after that time.

Goins' own testimony contains nothing to indicate either the extent or the cause of his disability, other than the following

exchange with the Deputy Commissioner at page 25 of the Report:

"Question: Do you feel you are able to work now?

"Answer: No sir.

"Question: Can you tell us what keeps you from being able to work now?

"Answer: Well, my neck and shoulder blade."

Page 27 of the Commissioner's Report describes a demonstration by Goins of the winging of his right shoulder blade, made at the Commissioner's request; the Commissioner noted that Goins was "showing inability to raise the [left] arm not higher than shoulder level * * *" (R. 27), and that, "there is what I term an elevation of that area [of the shoulder blade] which I will estimate is at least one inch in depth and covers an area from the shoulder level extending downwards approximately six inches and approximately four inches in width." (R. 28).

The rest of the testimony, which comprises some thirty-one pages in the Commissioner's Report, consists entirely of information concerning Goins' bills for food and rent and medical treatment, and descriptions of his bartending work and his relationships with his wife and girl friend.

The only other evidence in the record consists of the various medical reports submitted by the two parties; it was admitted and agreed between the parties that "if the doctors were called to testify they would testify in accordance with [their respective] reports contained in your file." (Report, p. 14).

■ We turn now to the various reports of these eleven doctors, with the observation that, since the Commissioner had before him only those reports, which are contained in the record before us, and the doctors involved did not personally appear before the Commissioner, the Court is in just as advantageous a position to make an evaluation of their credibility as the Commissioner himself was; in short, any finding of credibility on the part of the Commissioner should not be given the greater weight usually attributed to findings of credibility by the Commissioner in cases where the Commissioner has had the witnesses personally before him.

As previously noted, the first six doctors to examine and treat Goins all seem to have been made available to Goins by his employer. All examined Goins within a year of the accident, between May 1961 and March 1962. *All, without exception, were firmly of the opinion that there was nothing physically wrong with the claimant.*

Although Dr. F. T. Gidman, "a general practitioner specializing in industrial medicine" (R. 18), the first to examine Goins after his injury on May 10, 1961, noted that Goins had only a "strained left shoulder" and that he would be able to resume work in seven to ten days, (Employer's Exhibit 1), Gidman referred Goins to Dr. Walter Brent, an orthopedic surgeon (R. 18), who examined the claimant on May 23, 1961 (Employer's Exhibit 5). In his first report, dated May 30, 1961, Dr. Brent noted that Goins had "extreme disuse of the left shoulder" and obtained x-rays which revealed a fracture of the acromion process. (Brent later noted that original x-rays did not properly reveal the fracture [Employer's Exhibit 7]). However Dr. Brent noted in his report of October 27, 1961, that Goins' fracture had "healed solidly" and stated flatly that "the patient is in a position to be returned to work as of this date." (Emp. Ex. 6)

A further report by Dr. Brent, dated a few days later, on November 3, 1961, contains the following passages:

"We have treated [Goins] with sling fixation, physiotherapy and physical therapy and at this time he is complaining of lack of motion in his shoulder.

"Examination reveals the same well developed and nourished white male who holds his left arm to his side. *As he removes his upper clothing before me, he will freely move his shoulder.* There is no spasm of the muscular

structure of the shoulder girdle or arm and there is likewise no atrophy present. The patient actively resist [sic] all motions of the shoulder, however, with force and persuasion the motions can be completed.

"The last x-rays * * * revealed that the fracture was healed.

"I am of the opinion that *this patient is now in a position to be discharged with no residual disability* remaining. He actively resist [sic] all attempts of moving the shoulder, however, *in view of the fact that there is no loss of atrophy and good tone of the muscle structure, I am further of the opinion that this patient is using this arm fairly normal.*" (emphasis added) (Emp. Ex. 7).

Goins was then referred to Dr. Dan Baker, a general practitioner (R. 18) who first examined claimant on October 27, 1961, who had x-rays taken which were read as "negative for fracture, dislocation and bone pathology" (Emp. Ex. 3). Dr. Baker stated in his first report that Goins would be able to return to work in December 1961 (Emp. Ex. 3) and in his final report of March 15, 1962, stated that Goins was discharged by him on March 12, 1962, at which time the claimant was able to return to work, was capable of doing the same work as before the accident, and had no permanent injury as of that date. (Emp. Ex. 4).

Dr. Baker referred Goins to Dr. S. Winokur of New Orleans, a specialist in physiotherapy (R. 18), who treated Goins from November 20, 1961, to March 5, 1962. Dr. Winokur issued five medical reports on Goins' condition during this period. The first report noted that Goins was "found to have restriction of forward flexion [of the left shoulder] at 80 degrees, abduction at 45 degrees, hyperextension at 45 degrees, with apparently full internal and external rotation. Upon palpitation he has marked tenderness over the long head of the biceps in the bicepital groove." (Emp. Ex. 8). All of Dr. Winokur's subsequent reports reiterate the fact that the patient

"still continues to complain of pain in the left shoulder" and voluntarily restricted his shoulder movement. However, the reports evidence the doctor's increasing doubt of Goins' physical disability. On December 5, 1961, Winokur noted that Goins had "a tendency to walk holding his shoulder rigidly. However, upon examination, the shoulder can be passively forward flexed to 160 degrees and abducted to 140 degrees." (Emp. Ex. 9) On February 5, 1962, the doctor stated: "it is my opinion that this man ought to return to work." (Emp. Ex. 10) On February 22, 1962, Winokur remarked again that the patient "continues to complain of pain in the left shoulder," and that "he voluntarily restricts motion at 90 degrees of forward flexion, although with urging the arm can be raised to 170 degrees * * *. This patient is obviously not improving with treatment." (Emp. Ex. 11) Finally, in his report of March 5, 1962, Dr. Winokur states:

"At the time of initial examination he was very reluctant to move his left shoulder * * *. He has been given continuous treatment since that time, but still continues to complain of the same pain, and states that he is unable to work.

"During the course of the early part of his treatment, despite the fact that the patient stated he was unable to raise his arm more than 80 degrees, it was noted that *while putting on his undershirt and sweater, he could raise his arm actively without aid well above his head.* He was accordingly placed on resistive and active exercises * * * but even as of this date, he still *voluntarily* restricts forward flexion to approximately 90 degrees, although he can carry it to 175 degrees * * *.

"It is also interesting to note that there is no atrophy of the muscles of the left shoulder or shoulder girdle." (emphasis added) (Emp. Ex. 12)

Dr. R. C. Grunsten, an orthopedic surgeon (R. 18), examined the claimant on the referral of Drs. Baker and Win-

okur. His report, dated December 29, 1961, evidences a meticulous examination and consideration of the patient. The report indicates that the doctor could find nothing physically wrong with Goins and at one point it states:

"Circumferential measurements of the left arm and forearm reveal these to be identical with that of the right upper extremity in spite of the fact that this patient states that he is normally right-handed. This would tend to indicate that *this patient has maintained fairly good active use of this extremity* in order to prevent significant muscle wasting." (emphasis added) (Emp. Ex. 13)

Grunsten concludes:

"Physical examination at this time reveals the patient to present voluntary restriction in the ranges of abduction as well as anterior flexion with the measured range being 145 degrees of abduction and 165 degrees of anterior flexion. Internal and external rotation motions are unimpaired. No evidence of atrophy of the arm or forearm musculature is demonstrated, although the patient does present voluntary weakness of grasp involving the left hand. No evidence of atrophy of the shoulder girdle musculature is noted.

"* * * it is the opinion of this examiner that *the present clinical status of this patient's left upper extremity should not interfere with normal laboring activities including strenuous physical exertion.* As a matter of fact, it is felt that the best form of physical therapy for this extremity at the present time is that of regular daily use." (emphasis added) (Emp. Ex. 13, p. 3)

Dr. Richard Warren Levy, a neurosurgeon (R. 19), examined Goins on February 20, 1962. His report states:

"A neurological examination was carried out referrable to the neck and upper extremities. There was no head tilt, and the usual cervical lordotic curve was present. No tenderness was present in the cervical spine, nor was there paraspinal muscle spasm in the cervical region. The neck was supple.

"* * * the neurological examination at the present time reveals *no mechanical signs of injury or disease in the neck, and no evidence of nerve root or peripheral nerve injury* or disease in either upper extremity.

"It is my opinion that *this patient does not have a neurological disability to account for his present complaints.*" (emphasis added) (Emp. Ex. 14)

*  *  *  *  *  *

At this point it seems that Goins ceased his visits to doctors recommended by his employer and turned to those recommended by his attorney. Of five doctors thus recommended, three issued reports clearly supporting the employer's contention that there was nothing physically wrong with Goins. The report of a fourth doctor is highly inconclusive, and in fact also seems to indicate support of the employer's contention. The only one of Goins' doctors—the only doctor, in fact, in the total of eleven consulted since the accident—whose report supports the position of the claimant in this case is Dr. Blaise Salatich. We shall consider each of these last five reports in the order of their dates, mindful that all five were doctors of Goins' own choosing.

The first report is that of Dr. Jack Wickstrom, an orthopedic surgeon (R. 19), dated April 30, 1963. The report states that Wickstrom examined Goins on April 22, 1963. The report notes in part:

"There was a full range of motion in both shoulders and a suprisingly good range of motion in his cervical spine except for slight loss of complete extension and some limitation of rotation to both the right and left * * *. There was no atrophy of the musculature about the neck and shoulder or upper arm and the neurological examination of the upper extremities revealed normal reflexes and normal sensation pattern.

"X-rays made by Dr. Hardy revealed no evidence of recent pathology or

abnormality in the cervical spine or in either shoulder * * *."

Dr. Wickstrom's report concludes:

"At the time of our examination, I could find no evidence of significant persistent pathology to explain the severity of his persistent complaints. He had no evidence of nerve root irritation and no significant limitation of motion in his cervical spine or shoulders." (Claimant's Exhibit A)

Goins was later referred by his attorney to Dr. Robert G. Head of New Orleans, a neuropsychiatrist, who examined the claimant on September 5, 1963. His report contains this pertinent language:

"[The claimant] has a compulsive need to be active and busy and would be much better off if he were back in his previous job rather than the present one [bartending], and if the company would take him back and place him on gradually increasing activity I believe his pain would eventually go away.

"The present activity as a bartender is having an adverse effect on him and increases his marital conflict. The physical pain is necessary to prevent a more serious emotional disturbance." (Claimant's Ex. B)

Dr. Salatich's report is dated November 29, 1963, and states that examination of Goins was first made on March 19, 1962. The Salatich report will be considered below.

Dr. Raeburn C. Llewellyn, a neurosurgeon (R. 19) examined Goins on December 30, 1963, again upon the attorney's recommendation. Dr. Llewellyn noted that Goins himself evidenced "restriction of the cervical spine movements" and "soreness to palpation [sic] of the interspinous ligament in the mid and lower cervical area." (Claimant's Ex. D, p. 2) *However,* the doctor went on to state:

"I was unable to account for the patient's headaches, restriction of cervical movements and the numbness and pain present in the left upper extremity on the basis of a neurosurgical con-

dition that would follow injury to the face or cervical area some three years ago." (Claimant's Ex. D, p. 2)

Apparently in an effort to explain the cause of Goins' complaints, Dr. Llewellyn did note that Goins' "neurological status at the present time suggests the presence of an injury or dysfunction of the long thoracic nerve on the right," but Llewellyn was purely postulating on this point as appears from his following statement that "Specific nerve stimulation as by a physical therapist could accurately document the presence or absence of degeneration of this nerve, should this indeed be present." (Emp. Ex. D, p. 2) Moreover, Llewellyn went on to explain:

"This suspected weakness of the muscles attaching [to] the medial border of the right scapula constitutes less than 10% of the patient's present problem * * *. As is my opinion, more than 90% of the patient's total problem falls in conditions outside of the anatomical region of the right shoulder * * *. The patient's present neurological status has suggested nothing to imply the presence of a serious or progressive neurological disorder that could be expected to be associated with paralysis or weakness of other muscle groups in months or years ahead." (Claimant's Ex. D, pp. 2–3)

The last of claimant's doctors, David Wyatt Aiken, described by the parties as a "general surgeon" (R. 19), examined Goins on March 12, 1964. His report, dated March 24, 1964, noted several possible very serious abnormalities in Goins' condition, but his final opinion was not a confirmation of any of his postulations, but a recommendation that Goins "should have further x-ray studies by a neurosurgeon, to include a cervical myelogram and/or discogram between the fifth and sixth cervical vertabrae." (Claimant's Ex. F, p. 3) Aiken then warned, "If these studies are not carried out, continuing serious disability due to pain in the neck and other symptoms mentioned, can be expected." (Claimant's Ex. F, p. 4) In Aiken's Supple-

mental Report of April 7, 1964, the results of the very important myelogram were described flatly as revealing "negative or normal findings." (Claimant's Ex. G) The result of the important neurological consultation was simply that "the neurological consultant, in evaluating this patient, felt that he had not had the benefit of full and intensive conservative treatment, to include a well-planned course in physiotherapy, judicious wearing of a Thomas collar and the use of intermittent head traction at home * * *" (Claimant's Ex. G) Dr. Aiken's conclusion at this point was simply: "It is felt that if such a program is carried out the patient should be able to achieve almost full recovery from his neck disability." (Claimant's Ex. G) A less concrete and conclusive report could hardly be imagined. In view of the speculative but dire predictions of Aiken's first report, the subsequent normal myelogram findings, and the inconcrete second report, the Aiken examination results definitely favor the employer's contention that there was nothing physically wrong with claimant at that time that would actually disable him from his employment.

Thus, of all the reports reviewed, only that of Dr. Blaise Salatich presents any evidence that Goins was disabled subsequent to March 1962. The Salatich report, however, cannot be considered as "substantial evidence on the record as a whole" so as to warrant a finding of disability by the Commissioner. This is not solely a matter of superiority of numbers or even a matter of the relative weight of evidence, but of the worth of the Salatich report in and of itself.

Dr. Salatich is described by the Commissioner and the parties as "an orthopedic surgeon" (R. 19); however, that description ought to be qualified by noting that Dr. Salatich has previously testified that he had not been admitted to the American Board of Orthopedic Surgery and had twice been unable to pass the second examination of that Board, and that a third time the Board had refused to permit him to take the examination because he did not devote himself exclusively to that specialty. See Smith v. W. Horace Williams Co., 84 So.2d 223 (La.App. 1956).

The Salatich report, which consists of seven single-spaced typewritten pages, and appears as Claimant's Exhibit C in the Record, consists primarily of a recantation of Goins' complaints to Dr. Salatich and various descriptions of the accident of April 23, 1961. The doctor's diagnosis does include the following passages:

"Obvious and marked local tenderness could be elicited over the left articulations of the mid and lower cervical vertebrae, and also over the left nucchal attachments at the base of the skull. Quite obvious and significant generalized deep soreness and tightness could be elicited throughout the left supraspinous and interscapular musculature. The head and neck compression tests were markedly confirmatory in response, with these maneuvers initiating quite obvious and severe left posterior and lateral cervical and upper dorsal region, becoming markedly exaggerated on rotation of his head and neck to the left in a combined flexion and extension attitude. These maneuvers were followed by a visible and obvious loss of facial coloration and generalized weakness bordering on actual syncope. * * *
"Moderate tenderness could be elicited over the muscule-tendenous rotator cuff and also over the left acromio-clavicular articulation. Obvious and apparent severe pain could be elicited throughout his left shoulder and left cervical region on passive forceful downward pulling of his left arm and hand by this writer. * * *

"Impression: 1. Contusional and abrasional wounds of face and left ear, possible cerebral concussion (short duration). 2. Crushing-type injury left shoulder, involving healed fracture

of left acromium, including peri-articular, capsular, ligamentous and musculefascial injury, left shoulder, possible muscle-tendenous rotator cuff injury, subsiding, residual dysfunction and pain. 3. Tersion whiplash type neck injury involving peri-articular, capsular, ligamentous and muscle fascial structures cervical vertebrae, possible stretch-type left cervical nerve root injury, subsiding, residual dysfunction and causalgic pain. 4. Traumatic paralysis of right long thoracic nerve, with resultant right serratus anterior and rhomieid muscles, with resulant winging of right scapula. 5. Post-traumatic debility and emotional instability." (Claimant's Ex. C, pp. 3–4)

At one point in his report, Dr. Salatich concludes:

"These injuries resulted from apparently sudden and quite significant combined direct crushing and tersion whiplash type trauma exerted on these parts, when he was suddenly struck by the end of swinging drill pipe, being knocked over the edge of a barge * * *." (Claimant's Ex. C, p. 6)

On page 7 of his report, Dr. Salatich states:

"Considering the previously described quite unfavorable and undesirable clinical circumstances, including series of events having occurred in this case to date, it is strongly advised that a quite guarded prognosis be maintained and that any definite orthopedic evaluation of ensuing disability as to nature or degree be postponed to some later date, at least 8–12 months in the future. This condition is quite capable of becoming progressively more severe with the passage of time." (Claimant's Ex. C, p. 7)

Not only is the Salatich report completely at odds with those of all ten other doctors examining Goins (among whom were highly-qualified orthopedic surgeons, neurosurgeons, a physical ther-

apist and a neuropsychiatrist), but his report is in itself not worthy of merit. Among other things, it is interesting to note that the x-ray report ordered by Dr. Salatich, and on which he relied in his medical report (see Claimant's Ex. C, p. 4), indicated nothing whatever physically wrong with Goins other than "a 'winging' of the scapula *with no evidence of fracture or soft tissue mass.*" (emphasis supplied) (Claimant's Ex. H) This is not the first time that Dr. Salatich's diagnoses have come under suspicion. See Smith v. W. Horace Williams Co., supra; Hall v. Liberty Mutual Ins. Co., 153 So.2d 553 (La.App.1963); Herbert v. American General Ins. Co., 150 So.2d 627 (La.App. 1963). In the latter case, the Louisiana Fourth Circuit Court of Appeals stated emphatically:

"Dr. Salatich concluded that [the plaintiff in the case] has incurred a 'crushing type back injury involving the ligamentus and musculo fascial sections of the lumbo-sacral region, subsided, with residual disfunction and low back pain.' It was his opinion that the plaintiff was disabled from performing heavy manual labor.

"It is extremely significant to us, as judges, who not only desire, but actually require, the help of credible and qualified medical experts to enable us to deal justly with the miseries of human beings resulting from industrial accidents, to emphasize that Dr. Salatich, without the benefit of another examination before the trial hereof, ventured as an opinion, which was predicated upon an examination of the plaintiff made 5½ months prior thereto, that he was still disabled when the trial actually occurred." 150 So.2d at 629.

The medical jargon used by Dr. Salatich does not obscure the obvious fact that his report is nothing more than a collection of medical terms woven around the thread of the patient's own statements about the nature of his accident and his persistent complaints. The cal-

culated obsurity of the report, together with other factors noted above with respect to Dr. Salatich's orthopedic expertness, compels the conclusion that his report is not "substantial evidence" in support of the Commissioner's finding. When considered in relation to the medical reports of the other ten experts contained in the record, we find ourselves unable to accept the Commissioner's finding of disability by any stretch of the "substantial evidence" requirement.

■ "Substantial evidence" is more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S.Ct. 206, 83 L. Ed. 126 (1938). The Supreme Court has stated that reviewing courts, under the "substantial evidence" test, "must be influenced by a feeling that they are not to abdicate the conventional judicial function. Congress has imposed on them responsibility for assuring that [administrative agencies] keep within reasonable bounds. * * * [Agency] findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the [agency's] decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informal judgment on matters within its special competence or both." Universal Camera Corp. v. NLRB, 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951).

Speaking of the "substantial evidence" requirement under the *Universal Camera* case, the Fifth Circuit Court of Appeals has stated:

"This 'limited' scope of review does not, however, require us to abdicate our responsibility to the extent of mere 'rubberstamping' our affirmance of the [agency's] decision when, after full review of the record, including the evidence opposed to the [agency's]

views, we are unable to conscientiously conclude that the evidence supporting such decision is substantial." NLRB v. O. A. Fuller Super Markets, Inc., 5th Cir. 374 F.2d 197 March 8, 1967. 374 F.2d 197 (5th Cir. 1967).

Our review of all of the evidence in the Commissioner's report has forced our conclusion that there is no substantial evidence therein to support the Commissioner's finding of disability.

It has been argued that the "substantial evidence" test has been given an even more restricted interpretation than might be implied from the statements quoted above *where credibility of witnesses is at issue.* Although some cases have not hesitated to reverse erroneous agency findings of credibility (see, for example, Farmers Co-operative Co. v. NLRB, 208 F.2d 296 (8th Cir. 1953); Victor Products Corp. v. NLRB, 93 U.S.App.D.C. 56, 208 F.2d 834 (1953)), the review powers of courts do seem to have been subjected by some cases to greater restriction than might appear from the statements in the *Universal Camera* and *O. A. Fuller Super Markets* opinions, where agency findings of credibility of witnesses and the weight of their testimony is under review. See NLRB v. Marcus Trucking Co., 286 F.2d 583 (2nd Cir. 1961); NLRB v. Walton Manufacturing Co., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962).

However, it is evident that the holdings of the latter cases have been soundly based on the idea that the agency involved was a far better judge of credibility than the reviewing court, having had the opportunity to observe the demeanor and behavior of the witnesses involved during their testimony. Thus the Supreme Court, in upholding an agency finding of credibility, has stated:

"[T]he Examiner * * * sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records. * * * the

demeanor of a witness '* * * may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies.' Dyer v. MacDougall, 201 F.2d 265, 269." NLRB v. Walton Mfg. Co., supra.

If indeed such considerations may sometimes require an application of some rule narrower than the ordinary "substantial evidence" test of *Universal Camera,* they are not present here. As previously noted all eleven medical reports, on which the Commissioner's finding was based, were adopted into the record without the appearance of a single one of the reporting doctors. This Court is in just as fair a position to judge the credibility of these reports as was the Deputy Commissioner; we, therefore, find no reason to further restrict the already quite narrow interpretation of the "substantial evidence" requirement in this case. Because of the demonstrated conclusiveness of the evidence in the record, we have no hesitancy in determining that there was no substantial evidence and no reasonable basis in the record for the Commissioner's finding of disability.

Accordingly, it is ordered that an injunction issue against P. J. Donovan, Deputy Commissioner of the Bureau of Employees' Compensation, U. S. Department of Labor, and the same P. J. Donovan is hereby enjoined from enforcing the compensation order number 633–3 entered by him on July 21, 1964.

It is further ordered that the said compensation order be, and the same is hereby, set aside and annulled.