292 So.2d 773 (1974)
Mary Boslaugh EATON
v.
GENERAL ACCIDENT GROUP and L. M. Berry & Co.
No. 6153.
Court of Appeal of Louisiana, Fourth Circuit.
April 9, 1974.
*774 Pierre F. Gaudin, Gretna, for plaintiff-appellant.
Dufour, Levy, Marx, Lucas & Osborne, Michael Osborne, New Orleans, for defendants-appellees.
Before SAMUEL REDMANN and LEMMON, JJ.
SAMUEL, Judge.
Plaintiff filed this suit against General Accident Group and its insured, L. M. Berry & Company, for compensation benefits at the rate of $49 per week from June 2, 1971 for the duration of her disability. She also seeks penalties and attorney's fees based on the defendants' alleged arbitrary and capricious refusal to pay compensation benefits. Defendants answered, admitting plaintiff's employment, denying her disability, and affirmatively alleging compensation was not paid because she failed to prove an accident and refused to be examined by a physician of defendants' choice.
After a trial on the merits, judgment was rendered in favor of plaintiff and against both defendants, in solido, awarding her compensation benefits at the rate of $49 per week from July 1, 1971 until February 18, 1972. However, the judgment denied and dismissed plaintiff's claim for penalties and attorney's fees. Plaintiff has appealed. In this court she contends she is entitled to benefits for total and permanent disability and to penalties and attorney's fees. Defendants have answered the appeal seeking dismissal of the suit against them.
The employer, L. M. Berry & Company, handles yellow page listings and advertisements for South Central Bell Telephone & Telegraph Company. Plaintiff's work required that she sit in her employer's office and make telephone solicitations of yellow page advertisements. She used several telephone directories placed in a book case next to her desk and she could reach these directories without leaving her chair. Typing was not a part of her job. Her supervisor estimated that 99% of her work consisted of telephone solicitations and paper work. On rare occasions she personally called on a customer. In making such calls she used her car and carried one or two telephone directories, and possibly a briefcase. Outside solicitation was not a requirement of her employment, and had little effect, if any, on her income.
On June 2, 1971 plaintiff fell at work in the office and appeared to be badly shaken by the fall. She apparently struck her knee and then landed on her buttocks, causing a jolting injury to her back. She continued to work that day and worked regularly until June 9. She was absent from work June 9 through June 11 and also was absent on June 16 and 17. Her employer's records indicate, and she did report, these five days of absence resulted from an attack of influenza. From June 18 through September 10, 1971 plaintiff was carried on her employer's records as being on leave of absence. She never returned to work and no compensation payments were ever made to her.
The first physician consulted by plaintiff was Dr. Charles S. Wyckoff, an osteopath. On June 8, 1971, she complained to him of pain in the back, legs and knee. The only positive findings by Dr. Wyckoff were spasm of the musculature of her back and traumatic fibrositis, which he attributed to her fall. She again saw him on June 9, and his ultimate conclusion was traumatic fibrositis caused by the accident. However, Dr. Wyckoff speculated that this condition should have cleared in four to five weeks. We note that plaintiff did return to work after seeing Dr. Wyckoff.
Later plaintiff telephoned Dr. Wyckoff with regard to her condition. Upon *775 learning she had 101 of fever he recommended she see her family physician. Following his advice she saw that physician, Dr. Swan Ward, on June 15, 1971. Dr. Ward's primary concern was plaintiff's respiratory problems, but he also noted complaints of pain by her in the lumbar-sacral area. His examination in this area was basically negative, with no evidence of bruises or muscle spasm. He saw her on June 18 and June 22. On the latter date he found her asymptomatic and discharged her from further treatment.
Plaintiff then drove herself by automobile to her sister's home in Florida. On July 1, 1971 she was examined by Dr. James H. Pollock, an orthopedic surgeon, in Boynton Beach, Florida. Dr. Pollock diagnosed acute neck and back strain and prescribed medicine and physical exercises to alleviate her condition. On July 8 she had improved, but continued to complain of neck soreness when she drove her automobile. On July 15 she complained to Dr. Pollock of a recurrence of her neck and shoulder pain while she was swimming. Dr. Pollock was of the opinion plaintiff was making slow but progressive improvement and concluded her injuries would interfere with her working activities at that time. He estimated her disability as 5% of her body as a whole, which should gradually resolve.
Plaintiff next was seen by Dr. Blaise Salatich, in New Orleans. Her first visit to him was on September 7, 1971. At that time he found palpable muscle spasm of the neck and back indicating a lumbosacral and cervical injury. He advised ultrasonic treatments three times a week. From September 7, 1971 to February 19, 1973 plaintiff saw Dr. Salatich and/or received treatments 129 times. Dr. Salatich's opinion was that she is totally and permanently disabled from returning to her usual occupation as a telephone sales person for the defendant employer.
On February 18, 1972, Dr. Irvin Cahen examined plaintiff at the request of the defendants. Dr. Cahen found the plaintiff to be completely asymptomatic and was of the firm opinion she was able to perform the usual duties of her occupation as of that date. Plaintiff was also examined on November 27, 1972 by Dr. H. R. Soboloff, again at the request of the defendants. Dr. Soboloff's findings were essentially the same as those of Dr. Cahen. Dr. Soboloff found no objective symptoms and concluded plaintiff could return to her employment.
The issue of the extent of the plaintiff's disability is easily resolved. Prior to July 1, 1971 she was seen only twice by a local osteopath and several times thereafter by her family physician. Both of these physicians concluded she did sustain some injury from her fall, but the diagnosis of each was that her disability would be of a limited duration. On July 1, 1971 plaintiff was first seen by Dr. Pollock, an orthopedic surgeon, whom she continued to visit until August 30. Dr. Pollock was of the opinion, and there is no contradictory evidence in the record, that she was unable to return to work. A week later, she began treatment by Dr. Salatich, a physician locally recognized as a specialist in the field of orthopedic surgery. Dr. Salatich's testimony is uncontradicted for the period beginning September 7, 1971 and ending February 18, 1972 when the plaintiff was examined by Dr. Cahen, a Board certified orthopedic surgeon. Dr. Cahen's negative findings were substantiated by Dr. Soboloff's examination of November 27, 1972.
It is obvious that, on the basis of the record before him the trial court had no alternative but to award compensation from the time plaintiff first saw an orthopedic specialist until the time of Dr. Cahen's examination and negative findings on February 18, 1972. During that period there is uncontradicted medical evidence showing that, because of injuries received in the fall, she could not return to her duties with the defendant employer. However, after that date the trial court chose *776 to give more weight to the findings of Dr. Cahen than to the findings of Dr. Salatich.
Plaintiff contends the testimony of the treating physician, Dr. Salatich, is entitled to greater weight than that of the evaluating physician, Dr. Cahen, whose findings were later substantiated by Dr. Soboloff but who examined plaintiff only once. Defendants contend the latter two physicians are more reliable because of the alleged fact that the accuracy and credibility of Dr. Salatich's medical testimony frequently has been the subject of criticism by the courts.[1]
While the treating physician ordinarily is in a better position to determine the presence or extent of residual disability, this is only one consideration to be taken into account for the purpose of resolving conflicting medical opinions. Certainly, it alone is not conclusive. After a reading of the record in its entirety, we cannot conclude the trial judge committed error in deciding to reject the testimony of Dr. Salatich and accept the testimony of Dr. Cahen.
Our decision is not based solely upon the credibility of conflicting medical testimony. Plaintiff herself admitted that at the time of trial she was driving her car, visiting friends, and going to the grocery store at least twice a week. She also admitted she carried her groceries without assistance from her car into her home. Physical activity involved in driving her car and carrying groceries requires as much as, if not more than, the same amount of stress as plaintiff's position with the defendant firm. In view of plaintiff's own testimony and in view of the credible medical testimony in the record, we affirm the trial court's award of compensation benefits.
The other issue for our consideration is plaintiff's contention that she should have been awarded penalties and attorney's fees pursuant to LSA-R.S. 22:658.[2] On October 8, 1971, an attorney for plaintiff made formal demand upon the defendant for workmen's compensation benefits. On that date he addressed a letter to the claims manager of the defendant insurer to which he attached a copy of Dr. Salatich's medical report. This report stated without equivocation that plaintiff was then disabled. Again on October 29, 1971 plaintiff's attorney made formal demand on the claims manager to institute compensation payments. To this letter was attached medical authorizations executed by plaintiff, apparently for the purpose of allowing the defendant insurer to obtain information verifying plaintiff's physical condition.
Neither defendant made any compensation payment. This suit was filed on January 9, 1972 and only after suit was filed did the defendants request that the plaintiff be examined. It was at this time that Dr. Cahen performed his examination of February 18, 1972, discussed above.
The only defense offered by defendants to the claim for penalties and attorney's fees is the argued lack of credibility of Dr. Salatich and therefore of the report which was attached to the letter from plaintiff's attorney on October 8, 1971. Some mention is also made of the employer's records indicating that plaintiff was absent from *777 work on June 9, 10, 11, 16 and 17, 1971 because of an attack of influenza. However, the plaintiff's fall on June 2, 1971 was seen by her supervisor and by at least one other coworker, and was duly noted.
It cannot be questioned that the letter from plaintiff's attorney forwarding Dr. Salatich's medical report presented the defendants with their only medical opinion regarding plaintiff's condition, and this opinion supported her claim. In Bushnell v. Southern Farm Bureau Casualty Ins. Co.,[3] a similar question was presented. The court decided that where an injured employee makes demand for workmen's compensation benefits and the only medical evidence available supports her claim, the party upon whom demand is made cannot justify failure to pay because of a mere suspicion that the claim was not valid. In the Bushnell case plaintiff provided the defendants with a medical report, but the defendants chose to ignore the demand because their suspicion was aroused by the timing of the demand, since it was not received until after the claimant had been fired. The court reasoned that suspicion alone was not sufficient to withhold benefits since the defendants had no medical basis for their refusal and since the only medical evidence available at that time was favorable to the employee's claim.
While the courts have not afforded great weight to the testimony of Dr. Salatich on some occasions, he is regarded as an expert in the field of orthopedics and the courts have accepted, and do accept, his testimony as an expert in that specialty.
The statute under which penalties and attorney's fees may be imposed against an insurer is LSA-R.S. 22:658, which reads:
"All insurers issuing any type of contract other than those specified in R.S. 22:656 and 22:657 shall pay the amount of any claim due any insured including any employee under Chapter 10 of Title 23 of the Revised Statutes of 1950 within sixty days after receipt of satisfactory proofs of loss from the insured, employee or any party in interest. Failure to make such payment within sixty days after receipt of such proofs and demand therefor, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of 12% damages on the total amount of the loss, payable to the insured, or to any of said employees, together with all reasonable attorney's fees for the prosecution and collection of such loss, or in the event a partial payment or tender has been made, 12% of the difference between the amount paid or tendered and the amount found to be due and all reasonable attorney's fees for the prosecution and collection of such amount. Provided, that all losses on policies covering automobiles, trucks, motor propelled vehicles and other property against fire and theft, the amount of the penalty in each of the above cases shall be 25% and all reasonable attorney's fees." LSA-R.S. 22:658.
With regard to this state, the Louisiana Supreme Court made the following statement in Tullier v. Ocean Accident and Guarantee Corp.:[4]
"Under the basic statute, it is clear that penalties arise only from an arbitrary and capricious refusal by the insurer to pay a just claim after sixty days notice of the loss. The statute does not authorize the assessment of penalties merely because the insurer is the unsuccessful litigant."
While defendants are correct in their citation of Tullier to show that merely losing a workmen's compensation case does not carry with it an award of penalties and attorney's fees, LSA-R.S. 22:658 clearly provides that failure to make payment within 60 days after proper demand will *778 result in penalties provided the failure to pay is found to be arbitrary, capricious, or without probable cause.
In the case before us, the defendant insurer was furnished with demand and a medical report from a physician who has been recognized as an expert in the field of orthopedics. The report was favorable to the claimant. Without any contradictory medical evidence, it is not within the realm of the defendants to determine for themselves Dr. Salatich's credibility or the weight which is to be given to his opinion. Faced with the claim and the supporting positive report, it was the duty of the defendant insurer to take proper steps to investigate the claim in order to verify or negate its validity. This could have been easily done by virtue of the medical authorizations which the plaintiff freely and voluntarily furnished.
Penalty provisions such as that relied upon by the plaintiff have as their basic purpose the discouragement of employers and insurers from assuming attitudes of indifference to the difficulties incurred by injured employees.[5] In the present case, the defendants did nothing in response to the plaintiff's claim from its receipt immediately after October 8, 1971 until after plaintiff filed suit on January 9, 1972. Under all of these circumstances, failure to make any compensation payments within sixty days after receipt of the claim and medical report was arbitrary, capricious, and without probable cause under the statutory provisions. Consequently, an award in accordance with the statute will be made against the defendant insurer.
Revised Statute 22:658 itself provides that when penalties are assessed against an insurer, the amount of said penalties shall be 12% of the total amount of the loss, payable to the employee, together with reasonable attorney's fees for the prosecution and collection of the loss. The trial court award, which we affirm, was for 33 weeks at $49 per week, or a total of $1,617. Twelve percent of that sum is $194.04, in this case the penalty provided for by the statute.
Regarding attorney's fees, the record in the case is quite extensive and much testimony was adduced in the trial court in addition to the taking of the testimony of three physicians by deposition. After weighing the considerations available to us, including the amount recovered, our conclusion is that $700 would be a reasonable attorney's fee. Accordingly, we will assess the penalty and the attorney's fee, a total of $894.04, against the defendant insurer.
For the reasons assigned, the judgment appealed from is amended so as to add the following paragraph:
It is further ordered, adjudged and decreed that there be additional judgment in favor of the plaintiff, Mary Boslaugh Eaton, and against the defendant insurer, General Accident Group, in the full sum of $894.04.
As thus amended, and in all other respects, the judgment appealed from is affirmed; costs in the trial court to be paid by both defendants; costs in this court to be paid by the defendant insurer, General Accident Group.
Amended and affirmed.
NOTES
[1] Defendants cite: Barrere v. Commercial Union Insurance Group, La.App., 195 So.2d 461; Snell v. Intercoastal Airways, Inc., La. App., 165 So.2d 878; Herbert v. American General Insurance Company, La.App., 150 So. 2d 627; Baturo v. Employers' Liability Assurance Corp., La.App., 149 So.2d 627; Norman v. Standard Supply & Hardware Co., Inc., La.App., 126 So.2d 776; Easterling v. J. A. Jones Construction Company, La.App., 115 So.2d 888; Smith v. W. Horace Williams Company, La.App., 84 So.2d 223; Vogts v. Schwegmann, La.App., 56 So.2d 177; Noble Drilling Corporation v. Donovan, D.C., 266 F.Supp. 917.
[2] We note that penalties and attorney's fees can be imposed only against General Accident, the insurer. They cannot be imposed against the employer where, as here, the employer's liability for workmen's compensation claims is covered by insurance. LSA-R.S. 23:1201.2; Butler v. Peter Kiewit & Sons Company, La.App., 281 So.2d 467.
[3] La.App., 271 So.2d 267.
[4] 243 La. 921, 927, 928, 148 So.2d 601, 603, 604.
[5] See, for example, Poindexter v. South Coast Corporation, La.App., 204 So.2d 615.