352 So.2d 332 (1977)
Carrell KILLEBREW
v.
ABBOTT LABORATORIES.
No. 8433.
Court of Appeal of Louisiana, Fourth Circuit.
November 10, 1977.
Dissenting Opinion November 11, 1977.
Rehearing Denied December 13, 1977.
Writ Granted January 30, 1978.
*333 Alvin R. Childress, III, New Orleans, for plaintiff-appellant.
Hammett, Leake, Hammett, Hulse & Nelson, Robert E. Leake, Jr., New Orleans, for defendant-appellee.
Before LEMMON, GULOTTA and SCHOTT, JJ.
GULOTTA, Judge.
In this appeal, plaintiff, a pharmaceutical salesman, contends the trial judge erred in awarding disability payments under the defendant employer's long term disability plan for a period not to exceed 24 months. According to plaintiff, he is entitled to receive monthly disability benefits until age 65. The plaintiff employee was 45 years of age when discharged. The plan provides that benefits will not be paid for any period of disability in excess of 24 months for that disability where it has been "(b) caused or contributed to by mental illness or functional nervous disorder . . .." According to the trial judge, "The overwhelming medical evidence compels the conclusion that plaintiff's disability is due to a functional nervous disorder . . .."
Plaintiff contends the trial judge erred in interpreting the medical evidence and in erroneously applying the policy provisions limiting payment to 24 months. According to plaintiff, the disability was caused by an "organic disorder of viral encephalitis" which, under the policy, entitles him to monthly benefits until age 65. Pointing out that defendant has only made payments for a period of 4 months despite plaintiff's written notice and proof of claim and despite the judgment below, plaintiff further argues that he is entitled to penalties and attorney's fees as provided in LSA-R.S. 22:657. Finally, plaintiff questions the validity of the disability benefit plan which provides for a reduction in disability payments under the plan by the amount received from Social Security.
In 1969, while employed, Carrell Killebrew contracted viral encephalitis. Thereafter, he worked with difficulty occasioned largely by headaches until he was discharged from employment on February 20, 1973. Plaintiff was a participant, through payroll deductions,[1] in the long term disability plan provided for by defendant. After receipt of benefits amounting to 4-months disability payments and after denial of plaintiff's claim for monthly benefits to age 65, this suit followed.
*334 It is not disputed that plaintiff contracted encephalitis or that plaintiff suffered disabling headaches after he suffered the illness. Nor is it seriously disputed that plaintiff is disabled. What is disputed is whether or not the disability had been caused or contributed to by mental illness or functional nervous disorder. The evidence supports the trial judge's conclusion that the disability was due to a functional nervous disorder.
Paul F. Larson, M.D., a neurologist, first examined plaintiff on October 8, 1973. Killebrew complained of headaches and inability to cope with the pressures of his job. While aware that plaintiff had a history of encephalitis in 1969 and while acknowledging that it is an organic problem, Dr. Larson testified that his examination did not show any neurological deficit but did reveal considerable interpersonality and psychological problems. The doctor defined an organic disorder as an abnormality occurring in the brain structure. A functional disorder was defined as a disorder of the thinking process despite a completely normal brain, without any organic changes. Dr. Larson could find no signs of organic disease affecting plaintiff's neurological system and, therefore, classified his symptoms as functional nervous disorder. Though he acknowledged the encephalitis may have triggered plaintiff's emotional problems, the doctor considered plaintiff's disability in 1973 to be a functional one.
Dr. Grad L. Flick, a psychologist to whom plaintiff was referred for evaluation by Dr. Larson, supervised certain neuropsychological tests which were administered to plaintiff in November, 1973. This evaluation of plaintiff revealed no obvious evidence of any organic brain dysfunction. Dr. Flick testified that the personality pattern emerging from the tests was not typical of that seen in an organic disturbance such as encephalitis, but rather indicated a psychological profile showing vascular instability and a breakdown of psychological stability and reaction to stress. Though the psychologist acknowledged that organic pathology could have played a part in forming plaintiff's personality, he testified that plaintiff's problems are presently in a personality area rather than an organic area.
Dr. Thomas Oelsner, an internist who examined plaintiff on January 13, 1976, did not believe plaintiff had any organic brain damage resulting from encephalitis. He was of the opinion that plaintiff's disorder was emotional in nature with a functional basis. He stated that plaintiff had demonstrated a pattern of stress headaches developing under environmental pressure rather than a pattern of encephalitic headaches which are persistent and constant but gradually declining in intensity over a period of years. The doctor did state, however, that plaintiff's history indicated that he had the persistent type of postencephalitic headaches for a period of 9 months to a year and a half following contraction of the disease.
Dr. Edward E. Thornhill, an internist and plaintiff's treating physician, first saw plaintiff in 1969 when he had apparent encephalitis. Dr. Thornhill testified that he did not think plaintiff is suffering in any way from a functional nervous disorder, but rather is suffering from an "organic brain disease". According to this physician, because of underlying brain damage plaintiff suffered in 1969 from encephalitis, he cannot perform under stress and is unable to control his emotions. The doctor was of the opinion that plaintiff has sufficient brain damage to cause an emotional dysfunction impairing him from tolerating stress in a normal fashion. Although a vascular headache (which plaintiff later developed) is not ordinarily a result of encephalitis, according to the doctor, the emotional turmoil suffered by plaintiff as a result of being unable to work could cause the development of vascular headaches. A report of Dr. Thornhill, dated January 11, 1971, indicates that plaintiff's headaches took a different course and became more "truly vascular in type".
Despite Dr. Thornhill's testimony that plaintiff's emotional problems and vascular headaches are secondary to brain damage due to the viral encephalitis contracted in 1969, the testimony of the psychologist and *335 other physicians indicates that plaintiff's problem in 1973 was a functional nervous disorder.[2] This testimony comprises a sufficient factual basis for the trial judge's conclusion that plaintiff's disability was "caused or contributed to by mental illness or functional nervous disorder". Finding no manifest error, we will not set aside the trial judge's conclusion. Dyson v. Gulf Modular Corporation, 338 So.2d 1385 (La. 1976); Canter v. Koehring Company, 283 So.2d 716 (La.1973).
We find no merit to plaintiff's contention that the trial judge erred by his failure to "accept" the testimony of the treating physician (Dr. Thornhill) "over any other physician" who saw Killebrew on "one or a few occasions". While it is true that ordinarily great weight should be placed on the testimony of a treating physician, nevertheless, the trier of fact is not compelled to accept the testimony of that physician over the testimony of other physicians.[3] Resolving conflicting medical opinions lies within the province of the trial judge and will not be disturbed merely based on a conclusion that the trial judge failed to accord greater weight to one expert (albeit a treating physician) than to another expert.
We reject also plaintiff's argument that he is entitled to recover penalties and attorney's fees. Plaintiff contends that defendant's failure to make more than 4-months disability payments despite the trial court's judgment in his favor entitling him to payment for 24 months subjects defendant to penalties and attorney's fees as set forth in LSA-R.S. 22:657. As the trial judge stated, plaintiff's suit is not based on a contract of insurance, but rather on a long term disability benefit plan and trust between an employer and its employee.
The plan upon which plaintiff bases his cause of action became effective on December 1, 1972. Section 2 of the plan provides that the employer is to maintain a trust fund with trustees selected by the company who are to administer the plan. Though it is true that prior to 1972 defendant made available to its employees disability insurance with a commercial insurance company, the existing program is a company plan managed by the company trustees. Defendant is merely providing a fringe benefit to its employees and cannot be considered as a commercial insurance company. The employee's cause of action is based on his contract with his employer and not on a policy of insurance. The provisions of LSA-R.S. 22:657 apply only to commercial insurers which are subject to regulation by the Commissioner of Insurance. Furthermore, the provisions of LSA-R.S. 22:657 are penal in nature and must be strictly construed. Under the circumstances, we conclude LSA-R.S. 22:657 does not apply to the disability plan in the instant case and plaintiff is not entitled to penalties and attorney's fees.
Finally, we find no merit to plaintiff's contention that defendant is not entitled to reduce the disability payments by the amount received from Social Security. The long term disability benefit plan and trust provides that benefits payable "will be *336 reduced by the amount of all other income benefits". "[O]ther income benefits" include the following: "(a) any periodic cash payments provided on account of the employee's disability; (i) by the Federal Social Security Act on the employee's own behalf. . .." Plaintiff argues that these provisions should not be given effect because they afford "an unconscionable advantage" to defendant. In support of this argument, plaintiff cites 42 U.S.C.A. § 407, a provision of the Social Security Act prohibiting the transfer or assignment of a person's right to future Social Security payments. Plaintiff had previously signed an agreement with defendant acknowledging that any payments received under the Social Security Act would offset benefits payable under the long term disability plan.
The cited provision of the Social Security Law is not applicable in the instant case. Plaintiff has not assigned his right to future benefits. The agreement merely states that the employee's benefits under the disability plan will be reduced by the disability payments received under Social Security. This agreement is neither contra bonos mores nor prohibited by law and, therefore, is binding.
Accordingly, the judgment is affirmed.
AFFIRMED
LEMMON, J., dissents in part and assigns reasons.
LEMMON, Judge, dissenting in part.
I would impose penalties and attorney's fees for failure to pay the amount of benefits undoubtedly due under a contract of insurance. Defendant should not be allowed to withhold payment of benefits undoubtedly due because it contracted to pay benefits itself rather than using a commercial insurance company.
The majority holds that (1) the disability benefit plan is not a contract of insurance and (2) defendant is not an insurer subject to R.S. 22:657.
R.S. 22:5 defines insurance as "a contract whereby one undertakes to . . . pay a specified amount upon determinable contingencies.. . ."
When the employer and employee entered into the employment contract, disability benefit insurance was provided under a separate contract between a commercial insurance company and (a) the employer as policyholder and (b) the employee as beneficiary. Under the insurance contract the employer and employee agreed to pay a specified premium and the insurer agreed to pay a specified amount upon the happening of a determinable contingency. When the insurance contract was subsequently cancelled, the employer and employee entered into a contract whereby the employee agreed to pay a specified premium and the employer agreed to pay a specified amount upon the happening of a determinable contingency.[1]
I see no reason why this was not a contract of insurance, just as was the earlier contract issued by the commercial insurer for a similar premium to pay similar benefits upon a similar contingency. The fact that the employer was not licensed as an insurance company is not determinative of the issue of whether the employer's contract was one of insurance.
As to whether the employer was an insurer subject to R.S. 22:657, an insurer is defined by R.S. 22:5 as "every person engaged in the business of making insurance contracts . . .."[2] There is no requirement that insurance be the person's principal business.
*337 The state has a legitimate interest in regulating all contracts of insurance in the state, whether or not the making of insurance contracts is the person's principal business. Perhaps only those persons who are engaged in the business of making insurance contracts as a substantial part of their business should be subject to licensing and commission regulations. However, the performance of all insurance contracts is a legitimate concern of the state, regardless of who makes these contracts.
Other court decisions have considered contracts of insurance between employers and employees. The rule of liberal construction against an insurer has been held to apply to a contract of insurance issued by an employer to an employee. 56 C.J.S. Master & Servant § 169 (1948). And in Succ. of Rockvoan, 141 So.2d 438 (La.App. 4th Cir. 1962), this court, while not expressly holding that a retirement system established by an employer constituted a contract of insurance, was "unable to distinguish the death benefit features of the Retirement System from life insurance" and applied "the law relative to life insurance" in determining the applicability of codal requirements for donations and community property rights.
The public policy underlying R.S. 22:657 is the protection of the beneficiary of an insurance contract from an arbitrary and unreasonable denial by an "insurer" of benefits undoubtedly due. Had the commercial insurer that previously wrote the coverage denied a claim under these circumstances, the penalty would have been imposed. In my opinion the same underlying public policy should require the employer that made this insurance contract to pay timely all claims undoubtedly due or to pay a penalty for failure to do so.
NOTES
[1] A brochure describing the disability plan at defendant corporation indicates that an employee's contribution amounts to .2 of 1% of his basic earnings. If an employee earns $100.00 per week, according to the brochure, his contribution would amount to $.20 per week.
[2] In Mitchell v. Equitable Equipment Company, 330 So.2d 919 (La.1976), cited by plaintiff, the court concluded the medical evidence established that the employee's disability was caused by an ulcer (which did not pre-exist coverage) and by a pre-existing disease (which did pre-exist coverage). The policy in Mitchell excluded recovery where a disability commencing during the first year of coverage had been caused by a pre-existing disease for which the insured had received treatment or medicine during a three-month period prior to the effective date of the insurance. The claimant in Mitchell had not received treatment during that time period. In that instance, the Supreme Court concluded the employee's disability was covered. On the other hand, the disability plan in our case does not contain the limitation clause of the Mitchell policy, but instead provides that benefits will not be paid in excess of 24 months for a disability "caused or contributed to by mental illness or functional nervous disorder". In our case, the trial judge concluded the medical evidence preponderated that plaintiff's disability resulted from a functional nervous disorder and not from organic brain disease. The cases are factually dissimilar.
[3] See Eaton v. General Accident Group, 292 So.2d 773 (La.App. 4th Cir.1974).
[1] As a cash transaction, the employee paid only part of the premium. However, the employee earned the balance of the premium as compensation under the employment contract for services performed and that amount was not a gratuity paid by the employer. See Inland Steel Co. v. NLRB, 170 F.2d 247 (7th Cir. 1948), cert. den. 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112.
[2] "Person" is defined by R.S. 22:5 as:

"`Person' means any individual, company, insurer, association, organization, reciprocal or inter-insurance exchange, partnership, business, trust, or corporation."